UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

_____

In re:

    The Diocese of Rochester,                     Bankruptcy Case No. 19-20905-PRW
                                              Chapter 11

                      Debtor,

_____

    The Diocese of Rochester,

                      Plaintiff,

          vs.                                  Adversary Proceeding No. 22-02075-PRW

    AB 100 Doe, et al,

                      Defendant(s).

_____

**DECISION AND ORDER
DENYING MOTION OF DIOCESE
SEEKING TO ENJOIN THE PROSECUTION
OF STATE COURT ACTIONS AGAINST
INDEPENDENT CATHOLIC CORPORATIONS AND
DISMISSING COMPLAINT**

PAUL R. WARREN, U.S.B.J.

       For over two years, the victims of child sexual abuse ("Abuse Survivors") have refrained

from moving forward with their state court civil actions against parishes, schools and other

Catholic institutions ("Catholic Corporations") under the terms of a stipulated standstill agreement.

None of those Catholic Corporations have filed for bankruptcy protection—and, since the moment

the Diocese filed its Chapter 11 case, the Diocese has repeatedly reminded the Court that the assets

of the Catholic Corporations are beyond the reach of the Bankruptcy Court. But, after eleven

extensions of their agreement to refrain from pursuing their claims against the Catholic Corporations, the Abuse Survivors refused to extend the standstill agreement beyond March 23, 2022. In the two and a half years that have passed since the Chapter 11 case was filed by the Diocese, at least three Abuse Survivors have died, without ever having the chance to tell their stories to a state court jury.

In response to the looming termination of the standstill agreement, the Diocese filed this adversary proceeding seeking to enjoin "the prosecution of certain lawsuits against the Diocese[1] and/or non-debtor parishes, schools and other Catholic ministry entities and institutions within the geographical territory of the Diocese" by victims of child sexual abuse. (ECF AP No. 4 at 1; *see also* ECF AP No. 1). At the same time, the Diocese filed a motion requesting that the Court enjoin the Abuse Survivors from moving forward with their state court actions against hundreds of independent Catholic Corporations, none of which has sought bankruptcy protection. (ECF AP Nos. 1-1, Ex. A; 1-2, Ex. B). Portraying itself as a victim, trying to do right by the Abuse Survivors, the Diocese predicts that if state court litigation is permitted to move forward against any of the Catholic Corporations, "the Diocese may be forced to pursue a non-consensual plan of reorganization." (ECF AP No. 4 ¶ 5). That is a pretty heavy-handed threat to be leveled at the people who are the real victims here—the Abuse Survivors.

For the reasons that follow, the motion of the Diocese is **DENIED**. The Abuse Survivors can move forward with their state court civil actions against non-debtor independent Catholic

---

[1]     No suggestion has been made by counsel to any Abuse Survivor that the Diocese would be included in any state court action against a Catholic Corporation, absent leave of this Court. The Diocese's statement is curious by its presence. In July 2021, this Court refused to lift the automatic stay as to state court actions against the Diocese. (ECF BK No. 1212). No one has made a subsequent request for similar relief.

Corporations (and individual abusers)[2] and seek to reduce their claims to judgment. However, the Abuse Survivors are *not* permitted to attempt to enforce a state court judgment against any policy of insurance that provides coverage to the Diocese as a named insured, without obtaining the prior permission of this Court, following a motion on notice to all parties in interest.

## I.

## JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G) and (O). In the event that it is determined that this Court lacks the constitutional authority to enter a final judgment in this case, this Decision constitutes the Court's findings of fact and conclusions of law, to the extent required by Rule 7052 FRBP.

## II.

## FACTS

In February 2019, New York State enacted the Child Victims Act ("CVA"). N.Y. C.P.L.R. § 214-g. The CVA modified the existing statute of limitations, creating a "window" during which the victims of child sexual abuse could commence a civil action against those individuals and organizations alleged to be responsible for the abuse. As a result, victims whose claims were (in many instances) long-ago barred by the statute of limitations could now bring civil actions in the state court to seek redress for their injuries. The "window" opened on August 14, 2019, and was

---

[2] Litigation against the Diocese or the Bishop is not permitted to proceed in state court, however, absent further order of this Court.

to remain open for a one-year period.[3]  Faced with the prospect of potentially being named as a defendant in hundreds of civil actions by Abuse Survivors, on September 19, 2019, the Diocese filed a petition under Chapter 11 of the Bankruptcy Code.  (ECF BK No. 1).  The filing of the Chapter 11 action stayed all litigation against the Diocese.

From day one, the Diocese has asserted that "[u]nder New York Law, the Diocese is an incorporated legal entity, separate from the parishes and other Catholic entities within its territory." (ECF BK No. 7 ¶ 16).  The 86 parishes located within the 12-county territory covered by the Diocese are separate legal corporations, beyond the fiscal and operating control of the Diocese, and no parish has filed for bankruptcy protection.  (*Id.* at ¶¶ 17, 23, 24).  The 8 non-Diocesan Catholic schools located within the Diocese are similarly also separate legal corporations, and none of these schools has filed for bankruptcy protection.  (*Id.* at ¶ 25-27).  Finally, there are a number of other non-Diocesan Catholic entities[4] within the Diocese.  These Catholic entities are separate legal corporations, beyond the fiscal and operating control of the Diocese, and none of these entities has filed for bankruptcy protection.[5]  (*Id.* at ¶¶ 28-45).  Some of these Catholic Corporations are (or would be) defendants in civil actions brought by Abuse Survivors in state court.

Early on in the Chapter 11 case, the Creditors' Committee (acting on behalf of the Abuse Survivors) and the Diocese entered into a "standstill agreement," by which the Abuse Survivors

---

[3]     The one-year window was extended to August 14, 2021 by the State because of the Covid-19 pandemic.

[4]     These "entities" include: Catholic Charities of the Diocese of Rochester, Inc.; Rochester Catholic Press Association, Inc. ("Catholic Courier"); Catholic Youth Organization of Catholic Charities of the Diocese of Rochester; Providence Housing Development Corporation; Camp Stella Maris of Livonia, N.Y.; St. Bernards School of Theology and Ministry; Villa of Hope; De Paul Community Services and Becket Hall.  (ECF BK No. 7 ¶¶ 29-45; ECF AP No. 1-2, Ex. B).

[5]     For the sake of brevity, the Court will refer to the parishes, schools and other entities as "Catholic Corporations."

agreed to refrain from pressing their state court actions against the Catholic Corporations for a period of time. (ECF BK Nos. 428, Ex. B; 452). That agreement was extended eleven times, with the most recent agreement expiring on March 23, 2022. (ECF BK No. 1421). Under the agreement, the Catholic Corporations had a period of 45 days from termination of the standstill agreement to respond to any state court actions brought under the CVA. (ECF BK No. 452 ¶ 6). Unsatisfied with the progress of negotiations, the Committee refused to consent to any further extension of the standstill agreement. (ECF AP No. 4 ¶ 4).

In response, on April 6, 2022, the Diocese filed a complaint initiating this adversary proceeding. (ECF AP No. 1). The Diocese seeks a judgment declaring that the automatic stay, under section 362 of the Code, operates to prevent the Abuse Survivors from proceeding with litigation in their state court actions against the Catholic Corporations. (*Id.* at ¶ 50). In the alternative, the Diocese seeks an injunction barring the Abuse Survivors from continuing with their state court actions against any of the Catholic Corporations for a period of 90 days from the effective date of a confirmed Chapter 11 plan—a nebulous date that could be many months or years in the future. (*Id.* at ¶ 51). Contemporaneously with the filing of its complaint, the Diocese also filed a motion requesting that the Court issue a ruling declaring that § 362 of the Code automatically stays the Abuse Survivors from proceeding in state court against any of the Catholic Corporations. (ECF AP No. 4 ¶ 6). Alternatively, the Diocese's motion requests that if § 362 does not stay the state court litigation, the Court issue an injunction under § 105 of the Code and immediately enjoin the Abuse Survivors from moving forward with their state court actions against the Catholic Corporations. (*Id.*).

The Committee strenuously opposes the motion, arguing that § 362 does not stay litigation against the non-debtor Catholic Corporations and that the Diocese has failed to carry its burden of

proof necessary for the imposition of an injunction. (ECF AP No. 17). Specifically, the Committee argues that § 362(a)(1) and (a)(6) have no application here, and that § 362(a)(3), if it applies at all, should only be applied to prevent the Abuse Survivors from attempting to enforce judgments against insurance policies that also cover the Diocese, without the Court's prior permission. (*Id.* at ¶¶ 42-52). And, the Committee asserts that the Diocese has failed to prove that it would suffer an irreparable harm if the Abuse Survivors are permitted to go forward with civil actions against the Catholic Corporations. (*Id.* at ¶¶ 53-56, 85-87). The Committee is joined in its opposition by many of the attorneys representing a number of Abuse Survivors, in their quest to have their day in court to finally tell their stories to state court juries and have those juries decide the value of their claims. (ECF AP Nos. 18, 19, 21, 24, 25, 30, 31, 32, 33). The Committee and state court counsel confirmed that no state court litigation would (or could) proceed against the Diocese.

### III.

### DISCUSSION

The complaint that initiated this adversary proceeding and the motion before the Court are substantially similar (if not identical) to the complaint and accompanying motion filed in cases involving The Roman Catholic Diocese of Syracuse, New York (AP No. 21-50005-5-wak (Bankr. N.D.N.Y. filed on May 16, 2022), ECF Nos. 1, 5) and The Diocese of Buffalo, N.Y. (AP No. 20-01016-CLB (Bankr. W.D.N.Y. filed on May 2, 2020), ECF Nos. 1, 4). Except for the words on the pages of those documents, the similarities end there. In both the Syracuse Diocese and Buffalo Diocese cases, the request for injunctive relief was made very early-on in the bankruptcy case and

was directed only to a small subset of survivors.[6] The vast majority of Abuse Survivors in both of those cases, acting through the Committee, consented to a voluntary standstill of state court litigation against the non-debtor Catholic Corporations. The Diocese points to those cases as blueprints for this Court to follow in ruling on its motion. But, this case is markedly different. Here, the entire Abuse Survivor class (or nearly the entire class) opposes continuation of the self-imposed stay of litigation against the Catholic Corporations. And, this bankruptcy case is far from its early stages, having been filed nearly 3 years ago. So, while the Syracuse and Buffalo Diocese cases bear some similarities, there are far more differences to be considered here in balancing the competing interests of the parties. And, while the public interest in preserving the *status quo* in favor of the Diocese may have been strong in the early months of this case, the weight of public interest during these later months now tips in favor of the Abuse Survivors—who have suffered in silence for so long—to be able to seek redress in the state courts from the non-debtor Catholic Corporations.

## A. The Sweeping Injunction Sought by the Diocese Goes Too Far

In its motion, the Diocese requests that the Abuse Survivors be enjoined from litigating against the Catholic Corporations in state court for a period of *90 days after the effective date of a confirmed Chapter 11 plan*. (ECF AP No. 4, Ex. A ¶ 6). Not only is that date nebulous, it is most likely very distant—particularly if the Diocese follows through on its suggestion that the Diocese may pursue a Chapter 11 plan to which the Abuse Survivors do not consent. (ECF AP No. 4 ¶ 6). At oral argument, the Diocese tempered its request for a long-term injunction by suggesting that the Court issue a preliminary injunction that the court could revisit every 3 to 4 months. During

---

[6]    In Syracuse, the injunction request was directed to 6 Abuse Survivors. In Buffalo, the injunction request was directed to approximately 35 Abuse Survivors.

that 3 to 4 month period, and for each successive 3 to 4 month period, the Abuse Survivors would continue to be prevented from pressing their claims against the non-debtor Catholic Corporations.

A preliminary injunction is a tool that is to be wielded with great care. The Second Circuit has instructed the trial courts that:

> To obtain a preliminary injunction, a plaintiff must demonstrate: (1) *either* a likelihood that he will succeed on the merits of his claim, *or* that the merits present serious questions for litigation and the balance of hardships tips decidedly toward the plaintiff; and (2) that without the injunction, he will likely suffer irreparable harm before the court can rule upon his claim.

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994). Coupled with the standards for the imposition of a preliminary injunction established by the Second Circuit, the Supreme Court has more recently advised the trial courts that:

> Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents. . . . In awarding a preliminary injunction a court must also "conside[r] . . . the overall public interest." In the course of doing so, a court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."

*Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citations omitted).

Here, it is worth noting that the injunctive relief sought by the Diocese in its motion is identical to the relief it seeks in its complaint that initiated this adversary proceeding. As the Court sees the relationship between the motion and the complaint, a win by the Diocese on the motion would logically be a win by the Diocese on the underlying action. And, a loss by the Diocese on the motion would logically be a loss by the Diocese on the underlying action—calling for dismissal of the complaint. With those principles in mind, the Court turns to the claim of the Diocese that the automatic stay under sections 362(a)(1), (a)(3), and (a)(6) prevent the Abuse Survivors from proceeding against the non-debtor Catholic Corporations.

8

### 1. *Sections 362(a)(1) and (a)(6) Do Not Extend the Automatic Stay to the Catholic Corporations*

Taken together, sections 362(a)(1) and (a)(6) provide that the filing of a bankruptcy petition automatically stays "the commencement or continuation . . . of a judicial . . . proceeding *against the debtor* . . . or to recover a claim *against the debtor* that arose before the commencement of the [bankruptcy] case" and also stays "any act to collect, assess, or recover a claim *against the debtor* that arose before the commencement of the case." 11 U.S.C. § 362(a)(1) and (a)(6) (emphasis added). The Diocese argues that the reach of sections 362(a)(1) and (a)(6) is broad enough to prevent the Abuse Survivors from pressing their claims against the Catholic Corporations. The Court disagrees.

Both sections 362(a)(1) and (a)(6) specifically and in plain language refer to the stay of actions *against the debtor*. From the day that this Chapter 11 case was filed, on September 12, 2019, the Diocese has publicly and unequivocally insisted that the parishes, schools and Catholic Charities are separate legal entities, whose assets are beyond the reach of this Court. In a "Letter to the Faithful" from Bishop Matano, dated September 12, 2019, the Diocese said:

> I am sure you are concerned how this Chapter 11 filing affects your parish. The parishes are separately incorporated under New York State's Religious Corporation Law. Charitable entities such as Catholic Charities are separately incorporated under New York's Not for Profit Corporation Law. The ministries and operations of parishes and entities, such as our Catholic Charities agencies, should not be directly affected by the Diocese's Chapter 11 proceeding.

*Letter to the Faithful: Sept. 12, 2019*, https://www.dor.org/reorganization/.

The Catholic Corporations have not had to shoulder the burdens imposed by the Bankruptcy Code on debtors who submit to the jurisdiction of the bankruptcy court. And, but for the voluntary stay of litigation by the Committee, the Catholic Corporations are not protected by the automatic stay that sections 362(a)(1) and (a)(6) give to the Diocese. The Court holds that

9

sections 362(a)(1) and (a)(6) do not extend the bankruptcy automatic stay to Catholic Corporations.

### 2. The Diocese Has Failed to Carry Its Burden of Proof Under Section 362(a)(3) to Demonstrate that Litigation Against the Catholic Corporations Would Adversely Affect Property of the Estate

Perhaps recognizing that if successful in obtaining a finding by this Court that litigation in state court by the Abuse Survivors against the Catholic Corporations would adversely affect property of the Estate, and is therefore *automatically stayed* under section 362(a)(3), the Diocese has used a broad brush to paint a picture attempting to portray all litigation against the Catholic Corporations as necessarily diminishing the insurance coverage available to the Diocese. To that end, the Diocese asserts:

> [L]itigation in the CVA cases (even if only against the [Catholic Corporations]) will require the Diocese to expend funds to defend its own legal interests and will also erode collective insurance coverage shared by the Diocese and the [Catholic Corporations]. Because of this, the Diocese believes that any attempt by CVA Claimants to pursue the CVA Cases directly implicates property of the Diocese's bankruptcy estate and is therefore a direct violation of the Diocese's automatic stay.

(ECF AP No. 4 ¶ 9).

But, it is one thing to make that sweeping statement. It is another thing to prove it. Here, the Diocese made no effort to provide evidence showing that a *specific* CVA case would have a materially adverse impact on the per-occurrence limits of a *specific* policy of insurance. Instead, the Diocese invites the court to make a leap of faith and find that *any* state court litigation by *any* Abuse Survivor against *any* Catholic Corporation will necessarily adversely affect property of the Diocese's Estate. The Court declines that invitation.

The Court holds that the Diocese has failed to carry its burden of proving that a specific CVA case would materially erode coverage under a specific policy of insurance. As a consequence, the Court is not convinced that section 362(a)(3) stays litigation by Abuse Survivors

10

against non-debtor Catholic Corporations. However, in the event that a reviewing court might come to a different conclusion, the Court will go a step further "to mold its decree to meet the exigencies of th[is] particular case." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citations omitted). While litigation against the Catholic Corporations by Abuse Survivors can go forward in state court, this Court *will not* permit any judgment in favor of an Abuse Survivor to be executed against the proceeds of any insurance policy *under which the Diocese is named as a co-insured*, without the specific permission of this Court—as was suggested by the Committee. (ECF AP No. 17 ¶ 47). To be clear, under the authority granted by section 105(a) of the Code, the Court is *prohibiting* any Abuse Survivor from attempting to execute against or gain access to the proceeds of any insurance policy naming the Diocese as a covered co-insured, without the express permission of this Court in the form of an order, following a motion on notice to all parties in interest. This prohibition does not extend to any policy of insurance naming only a Catholic Corporation and it does not extend to other assets owned in the name of a Catholic Corporation. The Court molds the relief being granted to the Abuse Survivors in consideration of the overall public interest in allowing the Abuse Survivors to seek relief against the non-debtor Catholic Corporations in state court.

**B.** **The Diocese Has Failed to Demonstrate that a Preliminary Injunction is Warranted**

The Diocese argues that, if the Court finds that the reach of the automatic stay under section 362(a) does not operate to enjoin the Abuse Survivors from prosecuting actions against the Catholic Corporations, this Court should issue a preliminary injunction under section 105(a) of the Code. To obtain a preliminary injunction, it is necessary for the Diocese to demonstrate (i) the likelihood of success on the merits, (ii) the likelihood of irreparable harm to the Diocese absent the injunction issuing, (iii) the balance of hardships tips decidedly in favor of the Diocese, and (iv)

11

the issuance of the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994). A preliminary injunction, while a tool of equity, is an "extraordinary and drastic remedy which should not be routinely granted except upon a clear showing that the movant has carried its heavy burden." *In re Anje Jewelry Co.*, 47 B.R. 485, 487 (Bankr. E.D.N.Y. 1983) (citation omitted).

### 1. *Likelihood of a Successful Reorganization Is Not a Given*

In the bankruptcy context, "likelihood of success on the merits" is treated by the courts as "likelihood of successful reorganization." *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007). The Diocese points to several bankruptcy landmarks it has passed along the way, as an indication of its progress toward a successful reorganization. (ECF AP No. 4 ¶ 57). But, in its motion, the Diocese also points to the serious possibility that it may seek to confirm a non-consensual Chapter 11 plan—a plan that does not have the consent of the Abuse Survivors. (*Id.* at ¶ 5).[7] While obtaining confirmation of a non-consensual plan is not impossible, it makes the likelihood of a successful reorganization much more difficult. Given the Diocese's suggestion that it may seek to confirm a Chapter 11 plan without the consent of the Abuse Survivors, the Court cannot conclude that a successful reorganization is likely. As a result, this factor weighs against the imposition of a preliminary injunction.

### 2. *Likelihood of Irreparable Harm Has Not Been Demonstrated*

The Courts point to "irreparable harm" as the most important element necessary to justify the imposition of injunctive relief. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.

---

[7] In a filing made late last Friday, May 20, 2022, the Diocese made good on its prediction. (AP No. 19-02021-PRW, ECF Nos. 190-192).

Case 2-22-02075-PRW, Doc 49, Filed 05/23/22, Entered 05/23/22 14:45:29, Description: Main Document , Page 12 of 16

1985).  Injuries to be avoided by a preliminary injunction must be actual, imminent, and unable to be rectified through monetary damages alone.  *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995).  The bankruptcy courts have issued preliminary injunctions "where the action to be enjoined is one that threatens the reorganization process."  *In re Calpine Corp.*, 365 B.R. at 409-10 (internal quotation marks and citation omitted).

Here, the Diocese argues that allowing the Abuse Survivors to move forward with their actions against non-debtor Catholic Corporations will threaten the reorganization process by depleting insurance proceeds, creating the risk of collateral estoppel and evidentiary prejudice, and diverting the attention of key personnel away from the task of reorganization.  (ECF AP No. 4 ¶ 60-62).  The Court is not persuaded.

First, by this Decision and Order, the Court specifically prohibits all Abuse Survivors from attempting to enforce a CVA judgment granted by any court from executing against the proceeds of any insurance policy that names the Diocese as a co-insured, absent a further order of this Court. Next, this case is nearly 3 years old.  Key personnel are well beyond the scramble for information that is typical in the early stages of a large Chapter 11 case.  Finally, the Court is not persuaded that *an immediate and irreparable adverse economic consequence* will be visited on the Diocese as a result of this decision.  None of the state court CVA cases have advanced much beyond the filing of a complaint.  There is likely much discovery to be conducted before any of the cases will be ready for trial.  It will be many months or years before any of the CVA cases are presented to a jury.

### 3.  *The Balance of Harms Tips Decidedly in Favor of the Abuse Survivors*

The injunction sought by the Diocese is open-ended and tied to the "effective date" of a confirmed Chapter 11 plan.  That date could be many months or years in the future.  During the

nearly 3 years that this Chapter 11 case has been pending, at least 3 Abuse Survivors have died. Whether those Abuse Survivors had potential CVA claims against any of the non-debtor Catholic Corporations is now largely academic. But, what is not academic is the fact that those Abuse Survivors lost the chance to seek justice in a court of law. Given the age of many of the Abuse Survivors, if enjoined from going forward with actions against the independent Catholic Corporations, it is likely that more will be denied the chance to seek justice because the sands of time are working against them. Additionally, given the Diocese's unequivocal threat to pursue a non-consensual Chapter 11 plan, the valuation of CVA claims becomes vitally important to the confirmation process. The state courts are far better equipped to handle the trial of CVA cases (and provide the valuation of CVA claims) than is the bankruptcy court or the district court. And, the Abuse Survivors are entitled to have juries hear their cases—an option rarely available in bankruptcy courts.

The Court finds that the balance of harms to the Abuse Survivors, by the continued stay of litigation against non-debtor Catholic Corporations, is substantially greater than the speculative harms imagined by the Diocese.

### 4. The Public Interest Is Not Advanced By an Injunction Against the Abuse Survivors From Prosecuting CVA Cases Against Non-Debtor Catholic Corporations

Since this bankruptcy case was filed in September 2019, the Diocese and the Abuse Survivors, acting through the Committee, endeavored to find a "global resolution" to be memorialized in a consensual Chapter 11 plan. But the Diocese, the insurance carriers, and the Abuse Survivors have reached a point where a consensual resolution appears to be fading. And, the Diocese's threat of pursuing a non-consensual plan—one that the Diocese would attempt to force on the Abuse Survivors—is no small matter. It makes the possibility of a successful reorganization far more difficult and far more remote.

14

The Diocese asks this Court to place "the valuable public services performed by . . . the Diocese" above the interests of the Abuse Survivors in seeking justice and the right to proceed with their CVA cases against the Catholic Corporations. (*See* ECF AP No. 4 ¶ 64). The Catholic Corporations have, so far, been shielded from litigation by virtue of the Abuse Survivors' consent. That consent has been terminated. The Diocese asks this Court to find that the public interest is advanced more by the charitable public works it performs and will perform in the future, than would be the case if the Abuse Survivors were given the chance to ask for justice from a jury of their peers. But, what good are future charitable works if the people (children at the time) who suffered horrific acts of sexual abuse in the past (allegedly at the hands of clergy) are silenced? After all, it appears that silence played a leading role in perpetuating a climate where the abuse of children was possible. The appropriate remedy for the Catholic Corporations is to seek bankruptcy protection themselves, should the need arise, not for this Court to issue a sweeping injunction that would continue to shield non-debtor independent Catholic Corporations.

The Court finds that the public interest factor strongly favors denial of the injunctive relief sought by the Diocese.

## IV.

## CONCLUSION

The Abuse Survivors have been silenced, in many cases, for decades. The CVA window gave them the right to be heard. Instead, the Abuse Survivors agreed to refrain from pursuing their CVA claims against the independent Catholic Corporations in hopes that the Diocese's Chapter 11 case might provide an adequate measure of justice. After nearly 3 years, the Abuse Survivors have indicated their desire to seek redress from non-debtor Catholic Corporations. In response,

the Diocese has requested that the Court enjoin the Abuse Survivors, while also announcing an intention to seek confirmation of a Chapter 11 plan over the objection of the Abuse Survivors. After decades of silence, that might strike the Abuse Survivors as ironic.

The motion of the Diocese, seeking injunctive relief, is in all respects, **DENIED**. The non-Debtor Catholic Corporations are directed to answer or otherwise appear in previously commenced state court CVA cases within 21 days of this decision. Abuse Survivors whose claims against a non-debtor Catholic Corporation were not yet prosecuted, because of the standstill agreement issued in connection with this bankruptcy case, are permitted to file a CVA complaint in state court within 30 days of the date of this decision. Under 11 U.S.C. § 362(a), no CVA cases are to be commenced or continued against the Diocese, as a party defendant—this prohibition extends to and includes any CVA action against the Bishop. The Abuse Survivors are not permitted to attempt to enforce a state court judgment against any policy of insurance that provides coverage to the Diocese as a named insured, without obtaining the prior permission of this Court, following a motion on notice to all parties in interest.

Finally, because the relief sought by the Diocese in its motion is identical to the relief requested in the complaint in this adversary proceeding, which relief has been denied, the complaint is **DISMISSED, as MOOT**. The Clerk of Court is directed to close this adversary proceeding immediately.

**IT IS SO ORDERED.**

DATED: May 23, 2022                   _____/s/_____
        Rochester, New York              HON. PAUL R. WARREN
                                United States Bankruptcy Judge